Filed 12/4/20  P. v. Johnson CA4/2
(unmodified opinion attached)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E071648 |
| v. | (Super.Ct.No. FSB1104807) |
| ROBERT DARRELL JOHNSON, | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| Defendant and Appellant. | |
| | [NO CHANGE IN JUDGMENT] |

THE COURT

The court has reviewed the petition for rehearing filed December 2, 2020.  The petition is denied.  The opinion filed in this matter on November 18, 2020, is modified as follows:

On page 16, replace the first sentence in the last paragraph, which begins, "Defendant does not appear . . . , " with the following sentence:

We conclude there is substantial evidence in the record to support the conclusion that defendant concealed his purpose from Kester.

1

There is no change in the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
                                                                    J.

We concur:

RAMIREZ
                    P. J.


MILLER
                    J.

2

Filed 11/18/20  P. v. Johnson CA4/2 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E071648 |
| v. | (Super.Ct.No. FSB1104807) |
| ROBERT DARRELL JOHNSON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Michael A. Smith, Judge.  (Retired judge of the San Bernardino Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed with directions.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, Daniel Rogers and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Robert Darrell Johnson stabbed a bus driver 15 times, killing him. He pleaded not guilty and not guilty by reason of insanity (NGI). In the guilt phase of his trial, a jury convicted defendant of first degree, special circumstance murder and found he used a deadly or dangerous weapon during the commission of the murder. In the sanity phase, the jury found he was insane at the time of the murder. The trial court committed defendant to Patton State Hospital for restoration of his sanity.

Defendant appeals, contending the evidence admitted at trial was insufficient to prove first degree murder under either theory presented to the jury, to wit, (1) that the murder was willful, premeditated, and deliberate or (2) that defendant laid in wait before committing the murder. Therefore, he argues his conviction must be reduced to second degree murder, and the maximum term of his commitment must be reduced to 15 years to life plus one year for the deadly or dangerous weapon enhancement. We are unpersuaded and affirm the commitment order.

I.

PROCEDURAL BACKGROUND

In an information, the People charged defendant with one count of murder. (Pen. Code, § 187, subd. (a); all undesignated statutory references are to the Penal Code.) The People alleged the special circumstance that defendant knowingly committed the first degree murder of a bus driver while the driver was engaged in the performance of his duties (§ 190.25), and that he used a deadly or dangerous weapon, to wit, a knife (§ 12022, subd. (b)(1)). Defendant pleaded not guilty and NGI.

2

At the end of the guilt phase, the jury found defendant guilty of first degree murder and found true the special circumstance allegation and the deadly or dangerous weapon allegation. And in the sanity phase, the jury rendered a verdict of NGI. Thereafter, the trial court committed defendant to Patton State Hospital for restoration of his sanity for "an indefinite commitment."

Upon committing defendant for restoration of his sanity, the trial court was required to expressly state the maximum term of commitment, which is the maximum sentence that could have been imposed had he been found guilty *and* sane. (§ 1026.5, subd. (a); *People v. Hernandez* (2005) 134 Cal.App.4th 1232, 1237.) As correctly noted in defendant's opening brief, the trial court did not orally set a maximum term of commitment. Yet, the minutes purport to indicate defendant was committed for a maximum term of 25 years to life, the default sentence for first degree murder. (§ 190, subd. (a).) Because the jury found true the special circumstance allegation, the mandatory sentence for the murder was life in state prison without the possibility of parole (LWOP). (§ 190.25, subd. (a).) Therefore, the commitment order should have stated a maximum term of LWOP plus one year for the dangerous or deadly weapon true finding. (§ 12022, subd. (b)(1).) As explained, *post*, we conclude that substantial evidence supports defendant's conviction for first degree murder. We will direct the clerk of the superior court to correct the minutes to state the maximum term of defendant's commitment is LWOP plus one year.

Defendant did not timely appeal the commitment order,[1] but this court subsequently issued a writ of habeas corpus directing the superior court to accept a notice of appeal as timely filed. (See *In re Benoit* (1973) 10 Cal.3d 72, 86-89.) Defendant thereafter filed his notice of appeal.

## II.

## FACTS

At 10:13 a.m., on May 7, 2010, defendant boarded an Omnitrans bus driven by Lawrence Kester. The parties stipulated Omnitrans is a public transportation agency, and Kester was employed by Omnitrans and engaged in his duties as a bus driver. Defendant was holding in his hands what appeared to be a book, a folder, and some papers. The bus was empty as defendant entered, but he walked toward the back of the bus and sat in the rear, elevated section of seats. Approximately two minutes later, defendant got up and moved to an aisle-facing seat even further toward the back of the bus.

At 10:18 a.m., defendant once more got up from his seat. This time, he walked to the front of the bus. It appears from the video that, as he walked forward, defendant turned his body to his left and sat back into an aisle-facing seat on the left side of the bus (opposite the driver's side). However, an officer testified he could not be sure from the video footage whether defendant took a seat at the front of the bus or remained standing,

---

[1] An order committing an insane defendant to a state hospital is not a sentence, so no *judgment* has been entered. (*People v. John* (2019) 36 Cal.App.5th 168, 175.) However, the commitment order was immediately appealable. (§ 1237, subd. (a) ["An appeal may be taken by the defendant from . . . [¶] (a) . . . the commitment of a defendant for insanity . . . ."]; *John*, at p. 174 ["[S]uch a commitment order is considered a final judgment for the limited purpose of appeal."].)

and defendant is not seen again on video from either of the bus's cameras for another 17 minutes.

At approximately 10:35 a.m., the bus stopped and a passenger who had been seated in the front section of the bus exited through the front door. A few seconds after the bus had pulled away from the stop, defendant rushed toward Kester. He grabbed a railing with his left hand and stabbed Kester at least 15 times in the torso and arms with a knife[2] he held in his right hand. (It appears that as he began to stab Kester, the papers defendant had been holding dropped to the floor.) Kester lost control of the bus and it crashed into a tree, causing defendant to fall backward into the front door. The door opened, and defendant exited the bus and ran away.

Defendant ran from the bus and inside a nearby bank while still holding the bloody knife. He burst through the door, mumbled and paced around, and said something about the FBI and "the government going after his family." He was overheard saying, "'Oh, what did I do?'" and "'I can't believe I stabbed a bus driver.'" He threw the knife on the floor and kicked it toward a podium, then walked over to a desk, picked up a chair, and slammed it down. He sat in the chair, held his head in his hands, and once again said, "'What did I do?'" and "'I can't believe I stabbed a bus driver.'" Defendant also said,

---

[2] The knife is not visible on video until the attack. No evidence was presented during the guilt phase about when or how defendant obtained the knife. But during the sanity phase, a psychiatrist testified defendant had said he stole the knife from a supermarket the day before the attack to protect himself after he concluded his half sister was likely a party to a conspiracy against him.

5

"'Oh, my daughter, oh, my son,'" and something about his father. He then stood up and quickly walked out of the bank.

Defendant walked quickly through the bank parking lot, then ran inside a supermarket. He was talking to himself loudly and said he "did something bad" and he "stabbed somebody." Defendant then got down on the floor. He told a store manager he had stabbed someone but no longer had the knife, and he allowed himself to be handcuffed by the supermarket employees.

An officer with the Rialto Police Department responded to the scene of the crash and found Kester in the driver's seat of the bus with his seatbelt still fastened. Kester's clothing was soaked in blood, and he appeared to have stab wounds. He was not responsive and did not appear to be breathing. The officer moved Kester from the driver's seat, placed him on the floorboard of the bus, and performed first aid until fire department personnel arrived.

Another officer observed a book and what appeared to be a folder or envelope and some paperwork on the floorboard of the bus near the driver's seat. He collected the book and paperwork, some of which had defendant's name on it. The same officer found the knife on the floor of the bank. It had a black handle and a seven- to eight-inch blade.

The book recovered from the bus was about interrogation techniques used by the Central Intelligence Agency from the Cold War through the War on Terror. The envelope was signed by defendant and was entitled, "Evidence of conspiracy complaint of hypno-programming by local law enforcement and family members that conspire with Federal Bureau of Investigation that involves physical and psychological torture that

6

became psychological warfare." The loose papers found on the bus related to defendant's claims that he had been subjected to physical and psychological torture and mind control by the government and family members since his childhood. One of the documents was an "involuntary patient advisement," in which the reason given for defendant's treatment was that he stated he had experienced physical torture by the government and had said he "wanted to kill someone."

When interviewed after his arrest, defendant made spontaneous statements about conspiracies and was unable to provide a coherent narrative. The parties stipulated that defendant's blood had been drawn after his arrest and it tested negatively for the presence of alcohol. Defendant claimed he had been taken to Mexico against his will and sexually assaulted. He told the interviewer, "How can I trust you when I can't trust myself? The land of the free is not free at all." He also said, "I have no control over my own actions and my own thoughts." Defendant said the bank and the supermarket that he ran into after the accident were "involved." "Everybody inside [the bank and the supermarket] were smiling at me like they actually knew what was going on. I'm just going to let the video and witnesses talk." Defendant also said he had been "set up" and "framed."

Defendant does not challenge the verdict of NGI, so we need not recite the testimony from the sanity phase of his trial.

III.

DISCUSSION

The prosecutor tried defendant on two theories of first degree murder: (1) willful, deliberate, and premeditated murder; and (2) and murder by lying in wait. Defendant

7

argues the record does not contain substantial evidence to support either theory of first degree murder and, therefore, this court must reduce his conviction to second degree murder and reduce his maximum period of commitment to 15 years to life plus one year. We conclude the evidence supports both theories of first degree murder.

### A. Standard of Review.

"'""When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility."'"" (*People v. Booker* (2011) 51 Cal.4th 141, 172.) "'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.'" (*People v. Clark* (2011) 52 Cal.4th 856, 943.)

"'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.'" (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

B.     *Substantial Evidence Supports Defendant's Conviction for First Degree Murder.*

1.     *Additional background.*

At the close of the People's case-in-chief, defense counsel orally moved for a directed acquittal.  (§ 1118.1.)  Counsel argued the People had introduced no evidence of defendant's mental state at the time of the killing.  The trial court concluded sufficient evidence had been introduced to support the charge of first degree murder and denied the motion.  "[T]he evidence indicates the defendant was on the bus for a while.  The defendant was seated in the back of the bus.  Then he moved to a position towards the front of the bus.  There's inferences or conclusions that can be drawn that suggest he was seated directly behind the driver.  He remained there for about 17 minutes, when he then emerged from behind and stabbed the driver from behind him, in the side, while the driver was seat-belted in the seat and could not escape.  And then he fled the scene of the stabbing."  The court concluded the evidence supported the inference that the killing was intentional and deliberate, and "there's certainly an inference that can be drawn that there was some thought processes and premeditation that went into the killing."

During closing argument, the prosecutor argued the evidence clearly demonstrated defendant intended to kill, and acted with express malice aforethought, because he "leapt from behind" and used a knife "he had hidden somewhere" to stab Kester repeatedly as he was "strapped to the chair."  The same was true, according to the prosecutor, for the requirement that defendant acted willfully for purposes of willful, deliberate, and

premeditated murder. "[H]e intended to kill before he actually started stabbing the man 15 times."

With respect to deliberation and premeditation, the prosecutor argued the evidence demonstrated defendant moved from the back of the bus all the way to the front, bypassing the door in the middle, which tended to show he did not move forward because he intended to exit the bus. Defendant moved to a position at the front of the bus that was outside the view of the cameras and "relatively close" to Kester, and it appeared he sat down there. He stayed in the front section of the bus for 17 minutes, "waited behind" Kester and, after taking the knife out from where he had hidden it, "he jumped to kill." "These are actions that are not made impulsively or rashly. They are made with deliberations." Although the prosecutor conceded the attack was irrational and bizarre, he argued the evidence showed defendant deliberated before he struck.

Finally, the prosecutor argued the evidence demonstrated defendant laid in wait. The evidence showed defendant concealed his purposes because "[h]e didn't advertise it," and "[c]ertainly the victim didn't know." Likewise, the prosecutor argued the evidence showed defendant "waited behind Mr. Kester for some period of time— 17 minutes—reached in, pulled out that knife, for whatever opportunity he chose, and from a position of advantage, he intended to and did make a surprise attack." The prosecutor argued the amount of time defendant waited before striking was "substantial enough to show a mental state equivalent to deliberation or premeditation."

Defense counsel argued the evidence did not demonstrate defendant acted with express malice aforethought. According to counsel, the video showed that during the attack, Kester "is still talking and yelling when [defendant] is thrown up against the front of the bus, when the bus hits the tree, and that's when he leaves. The bus driver is still alive at that point." If defendant had intended to kill Kester, he "would continue his attack, but he did not." Counsel argued defendant's statements and conduct in the bank and the supermarket, and the fact he dropped the papers that documented his alleged torture, were inconsistent with an intent to kill and more consistent with a rash act. Moreover, defendant's delusions and belief that he was the victim of a conspiracy cast serious doubt on whether he "was mentally present enough" to carefully weigh the considerations of his choice such that his deliberation was in any way meaningful. Counsel also argued the evidence did not support the prosecutor's lying-in-wait theory. Although defendant "did come from behind," counsel argued the 17-minute gap[3] in the video established a reasonable doubt that defendant concealed his purposes and waited for an opportune time to strike.

---

[3] Counsel seemed to suggest the prosecutor had withheld video taken during the 17 minutes, but the record instead supports the inference that, during that time, defendant sat or stood in a place at the front of the bus where neither of the cameras was pointed.

11

### 2. *Willful, deliberate, and premeditated murder.*

Murder is the unlawful killing of a human being or fetus with malice aforethought. (§ 187, subd. (a).)  Malice may be express or implied.  (Former § 188, 1st par.)[4]  Express malice means "a deliberate intention unlawfully to take away the life of a fellow creature."  (*Ibid*.)  Malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."  (*Ibid*.)  An unlawful killing with express malice, such as a murder by lying in wait "or any other kind of willful, deliberate, and premeditated killing," is first degree murder.  (Former § 189, 1st par.)  An unlawful killing with implied malice is second degree murder.  (*Ibid*.)

To prove a killing was willful, deliberate, and premeditated, the prosecutor is not required to prove a defendant "maturely and meaningfully reflected upon the gravity of his or her act."  (Former § 189, 4th par.)  "'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.'  [Citation.]  The reflection may be arrived at quickly; it need not span a specific or extended period of time."  (*People v. Lopez* (2018) 5 Cal.5th 339, 354-355.)

---

[4]  Effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) amended sections 188 and 189 (Stats. 2018, ch. 1015, §§ 2, 3) to separate their previously unnumbered paragraphs "into sequential subdivisions and subsections."  (*People v. Prado* (2020) 49 Cal.App.5th 480, 488, fns. 5 & 6.)  The substantive amendments made to those sections by Senate Bill No. 1437 have no bearing here.  For the sake of clarity, we will cite to and quote from former sections 188 and 189 as they read on the date of defendant's offense.  (See Cal. Style Manual (4th ed. 2000) § 2:7, pp. 50-51 ["If a section or subdivision has several unnumbered or unlettered paragraphs, specific paragraphs should be referenced."].)

Although defendant does not necessarily challenge the sufficiency of the evidence that he acted willfully, we conclude substantial evidence supports such a finding.  A killing is willful if it is done intentionally.  (*People v. Delgado* (2017) 2 Cal.5th 544, 571; *People v. Moon* (2005) 37 Cal.4th 1, 29; see § 7, subd. (1) ["The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to."].)  Direct evidence of intent is rarely available, but intent may be inferred from the circumstances of the crime and a defendant's actions.  (*People v. Sánchez* (2016) 63 Cal.4th 411, 457.)  Defendant's unprovoked attack, during which he repeatedly stabbed at Kester and succeeded in inflicting 15 stab wounds in the arms and torso, is substantial evidence from which intent to kill may be inferred.  (*People v. Avlia* (2009) 46 Cal.4th 680, 701-702 [evidence the defendant repeatedly attempted to stab "an unarmed and trapped" man "and succeeded in stabbing him in the arm and leg" was substantial evidence of intent to kill].)

With respect to premeditation and deliberation, our Supreme Court has identified three categories of evidence to consider:  planning activity, motive, and the manner of the killing.  (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.)  When the record contains evidence in all three categories, the verdict is generally affirmed.  (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)  But those categories or factors are not exclusive or determinative—they are merely intended to guide a reviewing court's assessment of whether the evidence supports a reasonable inference that the killing was the result of defendant's preexisting reflection and not the result of an unconsidered or rash impulse.  (*People v. Cage* (2015) 62 Cal.4th 256, 276.)  "[C]onvictions for first degree murder

13

typically have been upheld where there is "'either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing.'"'" (*People v. Proctor* (1992) 4 Cal.4th 499, 529.)

We agree with the People that a reasonable jury could conclude the evidence showed defendant planned the attack. There is no dispute whatsoever defendant had the knife with him when he boarded the bus, and a strong inference may be drawn from the evidence that he concealed it among his papers or on his person until the attack or shortly before it. "That defendant armed himself prior to the attack 'supports the inference that he planned a violent encounter.'" (*People v. Elliot* (2005) 37 Cal.4th 453, 471; accord, *People v. Tully* (2012) 54 Cal.4th 952, 1008, fn. 24 ["[S]trong evidence of planning" included "the fact [the defendant] was armed" with a knife before he stabbed and killed the victim during a residential burglary.].)

Defendant's movements on the bus is also circumstantial evidence to support the inference that he planned the attack. When he first boarded the empty bus, defendant walked to the rear section of seats and sat down. Two minutes later, he moved to a seat even further back. And about three minutes after that, he got up and walked to the front of the bus. As the People argued below, if defendant had intended to exit the bus at the next stop or soon thereafter, he could have moved to a seat near the middle door of the bus. Instead, he walked to the front of the bus and, apparently, either sat in an aisle-facing seat in the section of the bus behind Kester or he stood in that section. He stayed at the front of the bus for the next 17 minutes. And, after another passenger who had been seated in the front section of the bus got off, defendant pulled the knife from where

14

he had hidden it and attacked Kester from behind. Kester had his seatbelt on and, obviously, his attention was on the roadway and safely operating the bus when he was attacked. Kester's vulnerability and the strong circumstantial evidence that defendant selected a spot behind Kester from which to strike is ample evidence of planning activity. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1237 ["Cases indicate that the total vulnerability of the victim and the evidence of a previously selected remote spot for the killing do suggest planning."]; *People v. Elliot*, *supra*, 37 Cal.4th at p. 471 [Planning activity included evidence the defendant surveilled a bar "for a later attack," then "waylaid and killed" the female victim, "after [the bar] had closed for the night and all other customers had left."].)

Finally, we agree with the People the manner of the killing is strong circumstantial evidence that defendant acted with deliberation and premeditation.[5] Using a knife with a seven- to eight-inch blade, defendant stabbed Kester 15 times in the arms and torso. "A violent and bloody death sustained as a result of multiple stab wounds can be consistent with a finding of premeditation." (*People v. Pride* (1992) 3 Cal.4th 195, 247; see *id*. at p. 248 [jury could reasonably conclude defendant premeditated and deliberated from the fact he stabbed the victim 18 times, all but one of them in the torso]; *People v. Morales* (2020) 10 Cal.5th 76, 102 [evidence the "victims suffered multiple fatal stab wounds to the neck or chest" was relevant to proving deliberation]; *People v. San Nicolas* (2004)

---

[5] Because we conclude the strong evidence of planning activity and the manner of the killing support the finding of premeditation and deliberation, we need not also consider evidence of defendant's irrational motive.

15

34 Cal.4th 614, 658-659 ["sheer number" of stab wounds to victim, "many of which would individually have been fatal," supported inference of premeditation].)

### 3. Lying in wait.

To establish first degree murder under a lying-in-wait theory, the prosecutor must establish a defendant concealed his purpose from the victim, he watched and waited for a substantial period for a favorable or opportune time to strike, and immediately thereafter he launched his surprise attack on the unsuspecting victim from an advantageous position. (*People v. Duong* (2020) 10 Cal.5th 36, 67.) The defendant need not have concealed his *physical presence* from the victim, and the element of concealment is satisfied by showing the defendant concealed his true intent and purpose by his actions. (*People v. Nelson* (2016) 1 Cal.5th 513, 549-550.) Our Supreme Court has never placed a fixed time limit on the requirement that the defendant watched and waited for a substantial period and has held a few moments may suffice. (*People v. Russell* (2010) 50 Cal.4th 1228, 1244; see *People v. Edwards* (1991) 54 Cal.3d 787, 823 ["We have never required a certain minimum period of time, only a period not insubstantial."].)

Defendant does not appear to challenge the sufficiency of the evidence that he concealed his purpose from Kester, and we conclude the evidence of concealment was substantial. As he boarded the bus, defendant was holding a book and some papers. As noted, *ante*, he did not have the knife out, and it was not visible on the video until the attack, from which a jury could reasonably conclude he hid the knife and waited to pull it out until he launched the attack or very soon beforehand. Defendant moved around on the bus but, otherwise, his actions before the attack as depicted in the video did not hint

16

that he planned to attack Kester or anyone else on the bus. That Kester was, in fact, surprised by the attack and took no defensive measures before defendant struck is substantial evidence of concealment of purpose. (*People v. Duong*, *supra*, 10 Cal.5th at p. 67 [concealment established by evidence the victim did not draw his own gun before being shot, "suggesting he was surprised by the attack"].)

Likewise, we conclude there is substantial evidence from which the jury could draw the reasonable inferences that defendant watched and waited for a substantial period for the right time to attack Kester. As noted, *ante*, the evidence suggests defendant took a seat in the front section of the bus, across from but behind Kester, or that he stood in that front section for 17 minutes.[6] The jury could reasonably conclude defendant watched and waited the unsuspecting Kester for an opportune time to strike.

Finally, the jury could reasonably conclude defendant immediately launched his attack on Kester once he believed the most opportune time to strike had arrived. After defendant had been sitting or standing in the front section of the bus for 17 minutes, the bus stopped and a passenger who had also been sitting in the front of the bus got off. Defendant struck from behind a few seconds after Kester had pulled away from the stop.

In sum, we conclude the record contains substantial evidence to support defendant's conviction for first degree murder under both theories presented to the jury.

---

[6] The suggestion made by defense counsel below and by defendant's attorney on appeal, that there is an unexplained 17-minute gap in the video (possibly because the prosecutor selectively chose which clips to present) during which defendant *might* have moved further back on the bus, is simply not supported by the record.

IV.

DISPOSITION

The clerk of the superior court shall correct the minutes to indicate defendant is committed to Patton State Hospital for a maximum term of life without the possibility of parole plus one year.  The commitment order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


McKINSTER
J.

We concur:


RAMIREZ
P. J.


MILLER
J.

18